Filed 3/10/23  P. v. Maestas CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075063 |
| v. | (Super.Ct.No. FSB18003426) |
| JEREMY NATHAN MAESTAS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Ronald M. Christianson, Judge.  Affirmed.

Spolin Law P.C., Aaron Spolin and Caitlin E. Dukes for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Robin Urbanski and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

Victim Aaron Taylor testified that defendant Jeremy Nathan Maestas and defendant's brother James Maestas robbed him.  Defendant used a shotgun to hit him in

1

the eye; James hit the back of his head.  He turned over his wallet, cellphone, headphones, and cigarettes, then ran home, where he collapsed.

Taylor's statements were inconsistent with respect to:  (1) what he was doing before the crime, (2) the words defendant used to demand his property, (3) whether defendant demanded his property before or after hitting him, (4) whether defendant swung the shotgun like a baseball bat, (5) whether defendant hit him with the butt or the barrel of the shotgun, and (6) whether he and defendant had any previous "beef[]." Moreover, no shotgun was found in defendant's house, although a .22-caliber rifle was.

Defendant was convicted of assault with a firearm and sentenced to a total of 60 years to life in prison.

In this appeal, defendant contends:

(1)  The trial court erred by admitting evidence regarding the rifle.  To the extent that defendant's trial counsel forfeited this argument by failing to object, defendant contends that that the trial court erred by denying his motion for new trial, in which he argued that that failure to object constituted ineffective assistance.

(2)  Trial counsel rendered ineffective assistance of counsel in five additional respects:

(a)  Failure to introduce all of Taylor's out-of-state prior convictions.

(b)  Failure to try to obtain Taylor's medical records.

(c)  Failure to have the rifle tested for DNA.

(d)  Failure to try to find surveillance video.

(e)  Failure to prepare defendant for cross-examination.

(3)  The trial court erred by sentencing defendant on the firearm enhancement under section 12022.53 rather than under section 12022.5.  Defendant also contends that his trial counsel rendered ineffective assistance by citing the wrong section number.

(4)  The trial court erred by denying defendant's *Romero* motion.[1]

(5)  The trial court erred by denying defendant's motion to strike the firearm enhancement.

(6)  Defendant is entitled to a remand so the trial court can consider whether to dismiss the enhancements under newly enacted legislation.

We find no error.  Hence, we will affirm.

I

STATEMENT OF FACTS

A.    *The Prosecution Case*.

1.      *Taylor's first statement*.

Defendant lived with his family, including his brother James, on Olive Street in Colton.  Victim Aaron Taylor lived around the corner, with his brother.

On August 16, 2018, around 10:50 p.m., police officers were dispatched to Taylor's home.  They found him lying on the ground, bleeding and in pain, with a blunt force injury to his right eye area.  He said his wallet and phone had been stolen.

---

[1]      A "*Romero* motion" is a motion to dismiss a strike prior in the interest of justice under section 1385.  (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.)

Taylor was taken to a hospital. An officer interviewed him there. He said he had been robbed by "Jeremy" and "James"; he gave descriptions that fit defendant and defendant's brother. He added that "they [had] done this before to him."

Taylor had a fractured eye socket and a laceration to the back of his head. He had surgery and was hospitalized for a total of eight or nine days. He was left with blurred vision in his right eye and a scar on the back of his head.

2.  *Taylor's second statement*.

Five days later, the same officer interviewed Taylor again. This time, Taylor picked defendant and his brother James out of photo lineups. He identified defendant as Jeremy, who "hit me in the head with . . . a shotgun," and James as defendant's brother, who was also there. He denied "beefing" with them.

Taylor said he walked his dog, then left the dog home and walked to an ARCO gas station. When he was across the street from defendant's family's house, he testified, "I seen a shadow move and I turned around and 'BLAM!'" Defendant hit him with a shotgun, swinging it like a baseball bat. The shotgun was black and silver. Taylor said the barrel struck his face. However, he also said "he wasn't sure" whether he was hit with the butt or the barrel, "because it happened so fast."

Taylor tried to run, but James tackled him. As he was trying to get away, someone hit him in the back of the head. They said, "Give me your shit" and emptied his pockets. They got his cell phone, his cigarettes, and his wallet.

4

Taylor started screaming. Somebody, possibly defendant's father, came out of a house and said, "Why you guys doin['] this[?]" Taylor then got away. He ran home but collapsed in the driveway.

3.    *Taylor's trial testimony*.

At trial, Taylor admitted prior felony convictions for residential burglary in 2006 and for larceny in 2008, both in Illinois. He also admitted that, as of 2018, he was an alcoholic and a drug addict. He had purchased methamphetamine from defendant's brother Anthony; he had also spoken to James once or twice.

About three weeks before the charged crimes, Taylor saw defendant outside a donut shop. Defendant asked him for cigarettes, then "[s]ucker punched" him in the face. Taylor ran into the donut shop; defendant left.

Taylor did not call the police because defendant had a Northside Colton gang tattoo. However, Taylor's brother said he would talk to defendant's uncle and "handle" the "situation." Through his brother, Taylor learned defendant's name.

On August 16, 2018, Taylor walked to a liquor store, bought a 40-ounce beer, drank it, then started walking home. When he was on Olive Street, across the street from defendant's house, he turned around and saw defendant and defendant's brother James. Defendant was holding a black and silver shotgun. Defendant said, "Break yourself or get naked"; "you know what this is." That meant they were robbing him. He turned over everything he had on him, including a cell phone, a wallet, cigarettes, and headphones.

5

Defendant then "lunged" at Taylor with the shotgun and "smashed" him in the face with the butt. Taylor denied telling police that defendant swung the shotgun like a baseball bat. Taylor "wrestl[ed]" with defendant, trying to grab the shotgun, but James hit him in the back of the head. Their father came out and yelled, "Hey, what's going on[?]" Defendant and James were distracted, and Taylor ran "for [his] life." He got to his driveway and screamed for help before collapsing.

4.     *The search of defendant's family's house.*

On September 5, 2018, the police searched defendant's family's house. There were 14 or 15 people inside, 9 or 10 of whom were adults.

Defendant was in a shed in the back yard that had been converted to a bedroom. He did not come out until the police had been issuing commands on a loudspeaker for 15 minutes.

The police did not find a shotgun, nor did they find anything belonging to Taylor. However, the house was extremely cluttered, including by bags of trash, so the police were not able to search everything. In the main house, in a safe inside a closet, they did find a .22-caliber rifle.

When the police interviewed defendant, he denied having been in a fight, knowing Taylor, or being a gang member.

5.     *Gang evidence.*

Gang experts testified that defendant and his brother were members of the Northside Colton gang. One gang expert testified to the primary activities of Northside

Colton and to crimes of which its members had been convicted. In her opinion, defendant and his brother committed the charged assault and robbery in association with and for the benefit of the gang.

B. *The Defense Case*.

Defendant took the stand and admitted hitting Taylor, but only with his fist, and only in defense of habitation. He admitted a 2014 felony conviction for assault with a deadly weapon. He also admitted that he was a member of Northside Colton, but he testified that James was not.

Defendant testified that he knew Taylor because Taylor had once used drugs with James at defendant's house. He denied hitting Taylor at the donut shop.

Once, according to defendant, Taylor walked into defendant's house through the side door, without knocking. Defendant told him to leave.

On August 16, 2018, defendant found Taylor using drugs with James again. Taylor became "loud, disrespectful," and "belligerent." Defendant told him, more than once, to leave. Taylor refused to leave, so defendant punched him once in the face. Defendant's father came in; he, too, told Taylor to leave. Taylor then left.

When defendant was arrested, the police asked if he had been in a fight near his house; he said no, because it had been inside the house. However, he admitted falsely denying that he knew Taylor.

7

II

STATEMENT OF THE CASE

During jury selection, defendant made an oral *Marsden* motion,[2] based on trial counsel's failure to try to obtain surveillance video. The trial court denied the motion.

Defendant and James were tried together. Defendant was convicted of assault with a firearm (Pen. Code, § 245, subd. (a)(2)),[3] with enhancements for personal use of a firearm (§ 12022.5, subd. (a)) and for personal infliction of great bodily injury (§ 12022.7, subd. (a)). James was acquitted of assault with a firearm. The jury hung on a charge of robbery and on a gang enhancement; the trial court dismissed these.

In a bifurcated proceeding, after defendant waived a jury, the trial court found three prior serious felony conviction enhancements (§ 667, subd. (a)) and three "strike" priors (§§ 667, subds. (b)-(i), 1170.12) to be true.[4]

Before sentencing, defendant filed a motion for a new trial. In it, he argued that his trial counsel had rendered ineffective assistance by:

(1) Failing to impeach Taylor with his out-of-state felony convictions.

---

[2] A *Marsden* motion is a motion to discharge existing appointed counsel, based on ineffective assistance, and to appoint new counsel. (*People v. Marsden* (1970) 2 Cal.3d 118.)

[3] All further statutory citations are to the Penal Code, unless otherwise specified.

[4] The trial court also found three prior prison term allegations true (§ 667.5, subd. (b)), but it dismissed them as duplicative of the prior serious felony conviction enhancements. (See *People v. Jones* (1993) 5 Cal.4th 1142, 1144-1145.)

(2) Failing to have the rifle tested for DNA, blood, or hair.

(3) Failing to prepare defendant for cross-examination.

(4) Failing to try to obtain surveillance video.

After an evidentiary hearing, the trial court denied the motion. Defendant also filed a *Romero* motion, which the trial court denied. Defendant was sentenced to a total of 60 years to life in prison.

III

EVIDENCE OF THE RIFLE

Defendant contends that the trial court erred by admitting evidence regarding the rifle.[5] To the extent that his trial counsel forfeited this argument by failing to object, he contends that the trial court erred by denying his motion for new trial, because that failure to object constituted ineffective assistance.

A. *Additional Factual and Procedural Background*.

After an unreported chambers conference, James's counsel noted for the record that he had objected both to the rifle and to a handgun that was also found in the search, as irrelevant. The trial court further noted that it had admitted the rifle but excluded the handgun. The prosecutor then asked whether there was any objection to a magazine and some bullets that were also found. James's counsel replied, "[S]ame issue." Defendant's counsel added, "Yeah, I think it's the same objection — correct — covering all that."

---

[5] The rifle itself was not admitted. However, we will use "the rifle" as shorthand for "evidence of the rifle."

Thus, as mentioned, there was testimony that police officers found a rifle in defendant's family's home. A photo of the rifle was admitted.

Defendant moved for a new trial, on grounds including that trial counsel rendered ineffective assistance of counsel by failing to seek to exclude evidence of the rifle as "inflammatory and irrelevant."

At the hearing on the motion for a new trial, trial counsel testified that, during the chambers conference, James's counsel had objected to both firearms. He himself had objected to the handgun; he did not remember whether he had objected to the rifle.

The trial court denied the motion for new trial. Regarding failure to object to the rifle, it ruled that the rifle was relevant: "So the evidence of the .22 rifle could actually cut both ways: Either the victim was mistaken about it being a shotgun and the .22 was the weapon, thus beneficial to the prosecution; or the .22 was not the weapon, and the police search of the residence[] of the defendant did not produce the weapon testified to by the victim, thus aiding the defense case."

It also ruled that: "Because [James's counsel] had already attempted to exclude the rifle, it would have been futile and pointless for [defendant's counsel] to also move for its exclusion as the Court's ruling would not have changed."

B.      *Discussion*.

Defendant contends that the trial court should have excluded the rifle as irrelevant (Evid. Code, § 350) and/or as more prejudicial than probative (Evid. Code, § 352), because Taylor insisted that he was struck with a shotgun.

10

James's counsel objected based on relevance; the trial court found that a further objection would have been futile. The People therefore concede that defendant's counsel did not forfeit the contention that the rifle was irrelevant. They argue, however, that, as far as the record shows, James's counsel did not object to the rifle as more prejudicial than probative; therefore, this objection was forfeited.

We accept the People's concession.**6** And we agree that trial counsel forfeited the objection that the rifle was more prejudicial than probative. (Evid. Code, § 353, subd. (a).) The record does not show that either defendant's counsel or James's counsel objected based on undue prejudice.

However, we also reject both grounds for objection on the merits.

"'A determination of relevance and undue prejudice lies within the discretion of the trial court, and a reviewing court reviews that determination for abuse of discretion.' [Citation.]" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1162.)

"When the specific type of weapon used to commit a [crime] is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the . . . weapon [used]. [Citations.] When the prosecution relies, however, on a specific type of weapon,

---

**6** Thus, we ignore *defendant's* concession that a further objection was *not* futile — that "had both defense attorneys joined in forcefully objecting to the admission of evidence of the rifle — including, in particular, Appellant's trial counsel[,] who was an experienced and respected public defender — the trial court's opinion may have been swayed."

11

it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons. [Citations.]" (*People v. Riser* (1956) 47 Cal.2d 566, 577, disapproved on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2, 648-649 and *People v. Chapman* (1959) 52 Cal.2d 95, 98.)

A reasonable juror could infer that Taylor was mistaken, and he was actually struck with the rifle. After all, it was nighttime; defendant took Taylor by surprise, from behind; Taylor had little time to look at the weapon before he was struck; and after he was struck, he was probably confused. When asked, "[A]re you sure it was a shotgun and not some other type of rifle?," he replied, "I'm not sure. I'm not an expert in guns." The photo of the rifle has not been transmitted to us; therefore, we are entitled to presume that it was black and silver, matching Taylor's description.

Admittedly, Taylor testified that the gun was the kind that one would "pump" or "rack." However, he never testified that defendant pumped or racked it in his presence.[7]

---

[7] Defendant asserts: "Taylor . . . affirm[ed], in response to the officer's question as to whether he saw anyone rack the shotgun, 'Yeah, yeah it was a real shotgun.'" This is misleading. The actual question and answer were:

"OFFICER: Okay, so did you see them rack it or anything? Do you [—] did it look like a real shotgun or . . .

"TAYLOR: Yeah, yeah[,] it was a real shotgun."

In other words, the officer asked a compound question. Clearly, Taylor was not saying "Yeah" to whether he saw defendant rack the shotgun. He was saying "Yeah" to whether it was a real shotgun.

12

In any event, in his motion for new trial, defendant conceded that the rifle "appears to be a pump action . . . ."

On this view, the rifle was relevant as evidence that defendant had access to a weapon that could have been used in the crime. The fact that it was found in the house, rather than in defendant's bedroom out in the shed, went to the weight, not the admissibility of the evidence. The jurors could reasonably infer that defendant had full access to his family's home.[8]

Moreover, on this view, the rifle was not more prejudicial than probative. It did not merely paint defendant as the sort of person who has deadly weapons; rather, it was significantly probative evidence linking defendant to the crime.

In any event, even assuming the rifle was irrelevant or more prejudicial than probative, its admission was harmless.

Under the state-law standard (Cal. Const., art. VI, § 13; §§ 1258, 1404), an error is prejudicial only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; see also *People v. Young* (2019) 7 Cal.5th 905, 931 [admission of irrelevant evidence and unduly prejudicial evidence].)

Defendant asserts that the error violated his federal constitutional rights, thus triggering the higher federal constitutional harmless error standard. "'[T]he admission of

---

[8] Defendant claims the rifle was found in a locked safe. The evidence showed that it was found in a safe but not that the safe was locked.

13

evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*.' [Citation.]" (*People v. Tran* (2022) 13 Cal.5th 1169, 1209.) And if the admission of the evidence was harmless under the state-law standard, then we can hardly say that the resulting trial was fundamentally unfair.

It would be hard to understate the significance of the rifle at trial. It was introduced in the course of testimony about the search of defendant's family's house. The photo of the rifle was just one of 29 photos taken during the search, most of them quite bland, which the prosecutor introduced one after the other. When he came to the photo of the rifle, he asked, "Can you tell us about this weapon?," and the witness identified it as a .22-caliber rifle found in a safe. No witness mentioned it again.

In closing argument, the prosecutor did not mention the rifle. Rather, he staked out the position that the weapon used was a shotgun. Certainly he did not argue that defendant was dangerous or a person of bad character merely because a rifle was in his house.

Defendant's counsel likewise did not mention the rifle. However, he did argue that the fact that no shotgun was found was evidence of innocence. Moreover, James's counsel argued that the rifle itself was evidence of innocence: "Then they don't find a shotgun. Well, maybe you would think obviously they got rid of the shotgun. Well, if they got rid of the shotgun, why is there a .22 rifle still in the house? . . . [I]f [defendant] is not allowed to have a gun, why would the .22 rifle still be there and the shotgun not be there? That doesn't make sense."

The rifle was far less inflammatory than the evidence offered to prove the gang allegations. That included evidence that defendant was a gang member, that he had Mexican mafia tattoos, and that the gang's primary activities included kidnappings, robberies, burglaries, assaults, and drug sales. Nevertheless, the jurors hung on the robbery charge and on the gang allegations, showing that they were not stampeded by inflammatory evidence.

Defendant argues that the jury hung on the robbery charge because the loot *was not* found, but it convicted on the assault charge because the rifle *was* found. This is speculation, and ill-founded speculation, at that. It is more likely that the jury hung on the robbery charge because there was no physical evidence, but it convicted on the assault charge because defendant admitted striking Taylor, and because it rejected his claim of defense of habitation. Indeed, Taylor's physical injuries proved that he was assaulted by someone; the injury to the back of his head proved that he was struck twice.

In sum, the trial court properly admitted the rifle, but even assuming it erred, the error was harmless. Hence, the trial court also properly denied the motion for new trial, to the extent that it was based on ineffective assistance in failing to object to the rifle.

IV

*MARSDEN* MOTION AND MOTION FOR NEW TRIAL

BASED ON INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that his trial counsel rendered ineffective assistance of counsel in five additional respects.

15

A.      *Standard of Review*.

"[T]rial judges . . . have the power to grant a new trial based on ineffective assistance of counsel."  (*People v. Lagunas* (1994) 8 Cal.4th 1030, 1036.)

"To demonstrate counsel's inadequacy, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.  Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.'  [Citation.]"  (*People v. Ng* (2022) 13 Cal.5th 448, 522-523.)

Defendant repeatedly argues that the burden is on the People to show, beyond a reasonable doubt, that counsel's deficient performance was not prejudicial.  Not so.  A defendant has the "burden of establishing inadequate representation and resulting prejudice as to each claim of ineffective assistance of counsel."  (*People v. Cox* (1991) 53 Cal.3d 618, 663, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  Moreover, "[a] defendant must prove prejudice that is a '"demonstrable reality," not simply speculation.'  [Citation.]  Prejudice requires 'a reasonable probability that a more favorable outcome would have resulted . . . , i.e., a probability sufficient to undermine confidence in the outcome.'  [Citation.]"  (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

Ordinarily, "'[w]e review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.'  [Citations.]"  (*People v. Thompson* (2010) 49

Cal.4th 79, 140.)  This includes an order granting a motion for new trial based on ineffective assistance of counsel.  (*People v. Callahan* (2004) 124 Cal.App.4th 198, 209.)

However, there is a split of opinion regarding the standard of review for an order *denying* a motion for new trial premised on ineffective assistance of counsel.

One line of cases applies the abuse of discretion standard.  (*People v. Wallin* (1981) 124 Cal.App.3d 479, 483; *People v. Aubrey* (1999) 70 Cal.App.4th 1088, 1104, disapproved on other grounds in *People v. Rubalcava* (2000) 23 Cal.4th 322, 334, fn. 8.)

Another holds that "we apply the standard of review applicable to mixed questions of law and fact, upholding the trial court's factual findings to the extent they are supported by substantial evidence, but reviewing de novo the ultimate question of whether the facts demonstrate a violation of the right to effective counsel.  [Citation.]" (*People v. Cervantes* (2017) 9 Cal.App.5th 569, 590-591, disapproved on other grounds in *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 314-315; accord, *People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725.)

To resolve this split, we look to *Strickland v. Washington* (1984) 466 U.S. 668, the wellspring of the ineffective assistance of counsel doctrine.  There, the High Court said, "The principles governing ineffectiveness claims should apply in federal collateral proceedings as they do on direct appeal or in motions for a new trial."  (*Id*. at p. 697.)  It also said, "Ineffectiveness is not a question of 'basic, primary, or historical fac[t]' [citation].  Rather, . . . it is a mixed question of law and fact.  [Citation.] . . .  [B]oth the

17

performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." (*Id*. at p. 698.)

On the authority of *Strickland*, we apply the "mixed question" standard of review.

B.      *Taylor's Out-of-State Priors*.

Defendant contends that it was ineffective assistance not to introduce all of Taylor's out-of-state prior convictions.

1.      *Additional factual and procedural background*.

The prosecution disclosed Taylor's out-of-state criminal history to trial counsel before trial. The parties stipulated to admit two of Taylor's prior convictions — a 2006 residential burglary conviction and a 2008 larceny conviction, both out of Illinois — for purposes of impeachment. The prosecutor commented, "The others we agreed are not moral turpitude convictions on his part."

The trial court ruled that the failure to offer additional prior convictions was a "non-issue," noting that Taylor had been impeached with his 2006 and 2008 convictions.

2.      *Discussion*.

Defendant has not shown deficient performance. A prior felony conviction is not admissible to impeach unless it shows moral turpitude. (*People v. Castro* (1985) 38 Cal.3d 301, 313-314.) Trial counsel and the prosecutor both knew that Taylor had more than two prior felony convictions; however, they agreed that the other convictions did not show moral turpitude. Defendant has not shown that this was incorrect. He asserts that

18

Taylor had a prior conviction for assault with a deadly weapon, but there is no evidence of this.

Defendant also has not shown prejudice. Taylor was impeached with two prior convictions, yet evidently the jury believed him. Without knowing what other prior convictions Taylor had, if any, we cannot say that they would have changed the jury's mind. Even assuming Taylor did have a prior conviction for assault with a deadly weapon, perhaps the prosecution could have introduced evidence of the facts underlying the conviction to show that it did not significantly detract from his credibility. (See *People v. Dalton* (2019) 7 Cal.5th 166, 213; *People v. Gutierrez* (2018) 28 Cal.App.5th 85, 88-90.)

C.     *Taylor's Medical Records*.

Defendant contends that it was ineffective assistance not to try to obtain Taylor's medical records.

Defendant did not argue below that trial counsel was ineffective because he failed to seek Taylor's medical records. Thus, he has forfeited this argument. (*People v. Verdugo* (2010) 50 Cal.4th 263, 309.)

Precisely because defendant never raised this argument below, there is no evidence that trial counsel *did* fail to seek Taylor's medical records. Moreover, defendant has not shown prejudice, because there is no evidence of what was in the medical records. We must presume that they were consistent with Taylor's testimony, unless and until proven otherwise.

19

D.     *Failure to Have the Rifle Tested.*

Defendant contends that it was ineffective assistance not to have the rifle tested for DNA.

1.     *Additional factual background.*

According to trial counsel, he did not have time to have the rifle tested for DNA, because defendant was insisting on a speedy trial. His office would not have authorized a test in any event, because the rifle was "not the gun that was used in the case."

The trial court ruled that trial counsel's strategy was sound. Moreover, it ruled that, as the rifle was not seized until 20 days after the crime, the absence of defendant's or Taylor's DNA would not have been particularly probative.

2.     *Discussion.*

Trial counsel gave two reasons why he did not have the rifle tested for DNA.

First, he did not have time to order a DNA test because defendant was insisting on his right to a speedy trial. Defendant argues that trial counsel could have waived his right to a speedy trial without his consent. Although he cites no authority for that proposition, he is correct. (*People v. Lomax* (2010) 49 Cal.4th 530, 556.) It is also true that "'[w]hen a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.' [Citation.]" (*People v. Poore* (2022) 13 Cal.5th 266, 307.)

However, this does not mean that effective assistance *requires* overriding a client's wishes — certainly not when, as here, those wishes represent the legitimate

20

assertion of the right to a speedy trial. "Decisions of th[e Supreme C]ourt and the Courts of Appeal have expressly recognized the tension between two rights guaranteed to every criminal defendant, the right to a speedy trial conferred by both the federal and state Constitutions and implemented through . . . statutory provisions . . . on the one hand, and the right to the effective assistance of counsel guaranteed by the Sixth Amendment, on the other hand. [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 938-939, disapproved on other grounds in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.) "Some rights are mutually exclusive. For example, a criminal defendant has a right to remain silent and a right to testify on his own behalf. He cannot do both, and hard choices are not unconstitutional." (*Frye*, at p. 940.) Here, defendant chose his right to a speedy trial; he cannot complain that effective assistance of counsel required that the rifle be tested.

Separately and alternatively, even assuming effective assistance did require trial counsel to override defendant's wishes, defendant still cannot complain. "The invited-error doctrine operates . . . to estop a defendant from claiming ineffective assistance of counsel based on counsel's acts or omissions in conformance with the defendant's own requests." (*People v. Lang* (1989) 49 Cal.3d 991, 1032.)

Second, trial counsel also testified that his office would not authorize DNA testing of the rifle because it was not "the gun that was used in the case."

Defendant seems to misunderstand trial counsel's explanation. He argues that the absence of his DNA would have been *relevant*, even though it was the defense position

that the rifle was not the gun used in the case. However, trial counsel did not testify that DNA testing would be *irrelevant*; rather, he testified that his office would not authorize it under the circumstances. It was not objectively unreasonable to forgo a test that his office would not have authorized.

Finally, defendant cannot show prejudice. For all we know, his and/or Taylor's DNA *was* on the rifle. Also, as the trial court reasoned, even if there was no relevant DNA on the rifle when it was found, 20 days after the shooting, defendant may have cleaned the rifle in the meantime. Alternatively, defendant may have used a shotgun, as Taylor testified.

E.      *Failure to Try to Find Surveillance Video*.

Defendant contends that the trial court erred by denying his *Marsden* motion, which was based on trial counsel's failure to try to find surveillance video. He also contends that the trial court erred by denying his motion for new trial, to the extent that it was based on trial counsel's failure to try to find surveillance video.

These are two different contentions, based on different states of the record; therefore, we discuss them separately.

1.      *Marsden* motion.

a.      *Additional factual background*.

At the hearing on the *Marsden* motion, defendant said that his girlfriend had asked the defense investigator to try to find surveillance video, specifically from the ARCO gas station and from neighbors between his house and Taylor's house.

Trial counsel responded, "We did make an attempt to get a surveillance video from Arco which should have been right across the street from this location. The video was not saved at this point. We made that request. I don't know why the public defender's office didn't make it earlier, but at this point that I got the case we made that request immediately. It wasn't available."

He had also checked for video from traffic cameras, but there was none. He had learned just that morning that defendant's girlfriend had asked the investigator to contact neighbors; in the ordinary course, that should have happened, but trial counsel had not had a chance to verify with the investigator that in fact it had.

The trial court found no grounds to relieve trial counsel. It noted that the start of trial was eight days away, so there was still time to do further investigation.

b. *Discussion*.

"[T]here is no absolute right to substitute counsel. [Citation.]" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 803.) Rather, "'[a] defendant is entitled to have appointed counsel discharged upon a showing that counsel is not providing adequate representation or that counsel and defendant have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. [Citations.]' [Citation.]" (*People v. Dickey* (2005) 35 Cal.4th 884, 917.)

"We review a trial court's denial of a *Marsden* motion for abuse of discretion. [Citation.] 'Denial is not an abuse of discretion "unless the defendant has shown that a

23

failure to replace counsel would substantially impair the defendant's right to assistance of counsel."' [Citation.]" (*People v. Ng*, *supra*, 13 Cal.5th at p. 500.)

Here, trial counsel had requested video from the ARCO as soon as he was appointed. Assuming, for the sake of argument, that it was ineffective assistance not to request it sooner, that ineffective assistance was chargeable to someone else in the Public Defender's Office, not to trial counsel; defendant was not entitled to have trial counsel discharged as a remedy. Trial counsel had also tried to obtain video from traffic cameras. Although he could not positively state that his investigator had tried to obtain video from neighbors, he added that should have happened; moreover, as the trial court found, there was still time for it to happen before trial.

Defendant complains about trial counsel's failure to try to get video from the liquor store. In his statements to the police, however, Taylor did not mention any liquor store; he said he had been walking his dog and had been to a gas station (i.e., the ARCO). He mentioned the liquor store for the first time at trial. Trial counsel therefore had no reason to try to obtain video from the liquor store.

Thus, defendant did not show any ineffective assistance.

2. *Motion for new trial.*

a. *Additional factual background.*

At the hearing on the motion for hew trial, trial counsel testified again that he did try to locate surveillance video. Based on Taylor's statements, Taylor had gone to an

ARCO gas station; an investigator went to the ARCO, but no video was available.[9]

Investigators also spoke to neighbors on both sides; however, trial counsel did not specifically tell the investigators to ask the neighbors for video.

The trial court ruled: "Although one could argue how much effort is enough effort in any particular case, . . . the attempts made by the defense team were adequate given the circumstances of this case."

b. *Discussion*.

Defendant cannot show prejudice, because the record does not show that, if trial counsel had tried harder to locate surveillance video, he would have found any.

Defendant proposes three possible sources. First, he suggests that, if trial counsel had contacted the ARCO sooner, its video would have been available. However, there was no evidence of this.

Second, he suggests that the liquor store where Taylor claimed to have bought a beer would have video, but again, there was no evidence of this. And, again (see part IV.A.2.B, *ante*), Taylor did not claim to have gone to a liquor store until he was on the stand, so trial counsel had no reason to seek video from the liquor store.

Third, he claims "neighbors have told [defendant]'s family" that they have surveillance cameras and that a defense investigator never contacted them. Not only is

---

[9]    At the hearing on the *Marsden* motion, trial counsel said he requested video from the ARCO "immediately." At the hearing on the new trial motion, however, he said his investigator went to the ARCO "maybe the 1st week of trial or right before we started trial."

this inadmissible hearsay, it is inadmissible hearsay that is not in the record. Defendant could have subpoenaed these neighbors to testify at the hearing on the motion for new trial but did not.

Defendant also cannot show prejudice for a separate and alternative reason: There was no evidence that video, if found, would have been exculpatory. For all we know, it would have corroborated Taylor. The neighbors' surveillance video might even have shown defendant assaulting and robbing Taylor.

Taylor had changed his story about having gone to a gas station, so it was unlikely that video from the ARCO would even be relevant. Defendant asserts that the ARCO was across the street from where the attack occurred, implying that it would have been relevant regardless of whether Taylor claimed to have gone to the ARCO. The record does not support this assertion. The ARCO was diagonally across from defendant's house. Taylor was attacked across the street from defendant's house, and thus not necessarily within camera range of the ARCO. In closing, trial counsel described the ARCO as being "around the corner" from the site of the attack. Trial counsel testified that he tried to get video from the ARCO because Taylor would have walked past it — i.e., not because it would have shown the attack.

F.      *Failure to Prepare Defendant to Testify*.

Defendant contends that trial counsel rendered ineffective assistance by failing to prepare him for cross-examination.

26

### 1. *Additional factual background.*

Trial counsel testified that, initially, defendant claimed he had an alibi. Defense investigators obtained statements from his father and his brother supporting an alibi defense. However, in trial counsel's opinion, an alibi defense was "not viable." He told defendant, "[I]f this was just a fight, . . . he needed to testify to the fact it was just a fight . . . ."

Defendant then gave the account that he gave at trial. They "went over what happened a number of times." "[H]e seemed pretty well to understand what he was going to testify to."

They also "discussed how to handle the gang allegation." Trial counsel advised defendant to admit being a gang member. Nevertheless, once defendant got on the stand, he tried to deny the gang evidence — e.g., he testified that his "CC" and "13" tattoos stood for Coco Chanel[10] and Chanel No. 3, rather than for Colton City and the Mexican Mafia. "[W]hen the testimony got into whether other individuals were involved in the gang, [he] didn't want to narc . . . ." "His cross-examination turned to a gang debrief and that definitely caught him off guard, and he definitely didn't understand how to deal with it in my opinion." Trial counsel commented, "I think I very much underestimated his understanding of what . . . admitt[ing] to the gang allegation meant." Trial counsel was "surpris[ed]" that the jury hung on the gang allegations, because "that was the weakest

---

[10]  Trial counsel misremembered this as Calvin Klein.

27

point of his testimony." Trial counsel did not talk to defendant about the prosecutor being "skilled" nor about how the prosecutor would "approach" him.

Defendant testified that he and trial counsel agreed on a "mutual combat" defense. He contradicted himself about whether that was always the plan, or whether he initially claimed to have an alibi. He denied knowing that his father and his girlfriend had provided declarations giving him a false alibi.

According to defendant, trial counsel visited him in jail only once, and then all they discussed was a body camera video. When trial started, defendant was not intended to testify, although James might. After Taylor testified, however, trial counsel told defendant he needed to testify. He gave him some jury instructions and said he would come to the jail later to prepare him, but he never did. Later, he said he had lost a card he needed to get into the jail. Defendant protested that he did not want to testify, because he was not prepared, but trial counsel told him, "Just tell the truth."

Contrary to defendant's testimony, jail visit logs showed that trial counsel had visited him four times, including two days before he testified.

James's counsel testified that, at the beginning of trial, it was an "open question" whether defendant would testify. However, trial counsel and defendant had already agreed that James should not testify.

The trial court accepted trial counsel's testimony, as corroborated by James's counsel. It therefore found insufficient evidence that trial counsel did not adequately prepare defendant to testify.

28

2. *Discussion.*

Defendant's testimony at the hearing on the motion for new trial was contradicted and even, at times, internally contradictory. Thus, he focuses on trial counsel's own admissions — that he "underestimated [defendant's] understanding" of what it meant to admit the gang allegations, and that defendant's testimony pertaining to the gang allegations "was the weakest point of his testimony."

Defendant has not shown objectively unreasonable performance. Trial counsel did prepare defendant to testify, by going over and over his story. While trial counsel may have overestimated defendant's understanding, there is no evidence that this fell below an objective standard of reasonableness. For all we know, defendant gave every indication of understanding. The fact that defendant's testimony pertaining to the gang allegations was "weak[]" may be defendant's fault, not trial counsel's. After all, presumably his posttrial counsel prepared him adequately to testify at the hearing on the new trial motion, yet his testimony at that hearing, too, was weak. Trial counsel believed that defendant deliberately ignored his advice because he "didn't want to narc."

We cannot say that trial counsel had a duty to "go over how he's going to be approached by the district attorney and how he's a skilled prosecutor[.]" Trial counsel was not asked *why* he did not do this, so the only question is whether there could be a satisfactory explanation. (See *People v. Caro* (2019) 7 Cal.5th 463, 488.) He could reason that this might make defendant unduly anxious and afraid, and it was sufficient

that he had told defendant to tell the truth.  Defendant got in trouble on cross-examination only when he tried to lie about his gang affiliation.

Defendant also has not shown prejudice.  The only respect in which he faults his own testimony is with respect to the gang allegations.  However, the jury hung on these, and the trial court dismissed them.  He claims that his testimony regarding the gang allegations "undoubtedly" damaged his credibility on other points, but this is speculation.  His testimony that he merely punched Taylor once in the face lacked credibility anyway, as he did not explain the injury to the back of Taylor's head.  And it did not help that he had to admit lying to the police.

In sum, defendant cannot show that, if trial counsel had prepared him more or differently, he would have done any better.  (See *People v. Berryman* (1993) 6 Cal.4th 1048, 1082 ["defendant does not establish ineffective assistance in trial counsel's asserted failure to more fully prepare criminalist Schliebe for his testimony.  He does not demonstrate that fuller preparation would have yielded favorable results."], disapproved on other grounds in *People v. Hill* (1998) 17 Cal. 4th 800, 823, fn. 1.)

G.      *Cumulative Prejudice*.

Defendant contends that, even if no one instance of assertedly ineffective assistance was prejudicial, standing alone, the instances were cumulatively prejudicial.

Almost all of our reasons for finding each instance not prejudicial apply to that instance independently of the others.  They do not turn on the strength of the overall case against defendant.  For example, we held that the failure to object to the rifle was not

prejudicial because the trial court would have overruled the objection in any event. (See part III.B, *ante*.) Similarly, we held that the failure to seek Taylor's medical records was not prejudicial because we do not know what those records would have shown. (See part IV.C, *ante*.) Such reasons do not cumulate.

Only our holding that the failure to prepare defendant more fully to testify (see part IV.F.2, *ante*) turns, at least in part, on the strength of the other evidence. However, because the other reasons do not, this reason has nothing to cumulate with.

V

SENTENCING UNDER THE WRONG FIREARM ENHANCEMENT

Defendant contends that the trial court erred by sentencing him on the firearm enhancement under section 12022.53 rather than under section 12022.5. He also contends that his trial counsel rendered ineffective assistance of counsel by citing the wrong section number.

A.     *Additional Factual and Procedural Background*.

An enhancement for personal use of a firearm under section 12022.5, subdivision (a) (section 12022.5(a)) carries a sentencing range of three, four, or ten years. By contrast, an enhancement for personal use of a firearm under section 12022.53, subdivision (b) (section 12022.53(b)) carries a mandatory sentence of ten years. Section

31

12022.53(b) applies to robbery but not to assault with a firearm. (§ 12022.53, subd. (a).)[11]

In connection with the charge of assault with a deadly weapon, the prosecution alleged a firearm enhancement under section 12022.5(a). The jury found this allegation true.

The probation report repeatedly noted that the enhancement was under section 12022.5(a). It recommended a 10-year sentence on this enhancement.

Trial counsel filed a motion to dismiss some of the enhancements, including the firearm enhancement. In it, he stated sometimes that the firearm enhancement was under section 12022.5(a) but sometimes that it was under section 12022.53. In its opposition, however, the prosecution cited the correct section.[12] It also noted that the sentencing range for the enhancement was "3-4-10."

At sentencing, the trial court said: "In aggravation the Court finds Mr. Maestas' prior performance on probation and parole unsatisfactory. He was on parole at the time of the commission of this offense. His prior juvenile adjudications and adult convictions are numerous and of increasing seriousness. There are no factors in mitigation. *The Court is justified in imposing the aggravated term for any sentencing choices the Court*

---

[11] In connection with the charged robbery, the prosecution did allege an enhancement under section 12022.53, subdivisions (b) and (e)(1). However, the jury hung on that count, and it was dismissed.

[12] At one point, the prosecution quoted a portion of trial counsel's motion, including its internal citation of the incorrect section. Unfortunately, it did not call attention to his mistake.

*has in this case and will do so.*" (Italics added.) It then imposed a ten-year sentence on the firearm enhancement. It did not cite any particular section number.

Because the trial court sentenced defendant pursuant to section 667, subdivision (e)(2)(A)(iii), the calculation of the base term for assault with a deadly weapon had to include all enhancement terms; the enhancements were then imposed on top of that base term. (See generally *People v. Dotson* (1997) 16 Cal.4th 547, 557-560.) Thus, the choice of 10 years, rather than 3 or 4, for the firearm enhancement effectively added 20 years, rather than 6 or 8, to defendant's minimum parole period.

B.      *Discussion*.

"""'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown . . . .'" [Citation.]" (*People v. Wiley* (1995) 9 Cal.4th 580, 592, fn. 7.)

Moreover, the record here is not silent. The trial court said was going to impose the aggravated term whenever it had discretion to do so; it also stated reasons for doing so. There was one and only one element of the sentence on which the trial court had such discretion: the firearm enhancement.

Also, on the probation report, next to the probation officer's sentencing recommendations, the trial court hand-wrote some figures that were different from those recommendations. They were not identical to the sentence that it ultimately imposed; for example, next to two of the three prior serious felony conviction enhancements, it wrote

33

"stay"; however, ultimately, it did not stay them. Next to the firearm enhancement, it wrote "4." Although ultimately, it imposed 10 years, this proves it knew it had discretion to impose a four-year sentence.

Under the general heading of this contention, defendant claims: "[T]he court could not have reasonably concluded that the 10-year enhancement was proper here." He does not seem to be arguing this as a separate assignment of error (see Cal. Rules of Court, rule 8.204(a)(1)(B).) Instead, he seems to be arguing that this is why the asserted error was prejudicial.

If only out of an excess of caution, then, we note that the trial court's reasons for imposing the upper term were sound. As aggravating factors, it noted, accurately, that defendant's prior performance on probation and parole were unsatisfactory; he was on parole at the time of the crime; and his prior convictions were numerous and increasingly serious. (See part VI.A, *post*.) It found no factors in mitigation.

In sum, then, the trial court did not sentence defendant under the wrong statute. This is sufficient to dispose of defendant's ineffective assistance contention; even if trial counsel was ineffective, defendant was not prejudiced.

In fairness to trial counsel, however, we note that in this instance, he was not ineffective.

Defendant argues that trial counsel erroneously conceded that the appropriate sentence was 10 years. Not so. In moving to strike the enhancements, he listed

defendant's "maximum exposure" on each element of the sentence, including 10 years on the firearm enhancement. That was correct.

Defendant also says, "[T]rial counsel incorrectly and prejudicially took the position that the court's only options were an enhancement of '10 years consecutive' or no enhancement at all." (Bolding omitted.) That is not fair. Trial counsel was moving to strike the firearm enhancement (among others). He therefore argued that the penalty for the firearm enhancement was disproportionate to defendant's conduct — i.e., hitting the victim with the firearm, rather than firing it. In this context, it was good strategy to emphasize the *maximum* sentence on the enhancement. However, nowhere in the motion did he say that the trial court's *only* alternative to striking the enhancement was to impose the maximum sentence.

VI

*ROMERO* MOTION

Defendant contends that the trial court erred by denying his *Romero* motion.

A.     *Additional Factual Background*.

At sentencing, defendant was 31.**13** He had the following prior convictions:

(1) As a juvenile:

(a) In 2005, for use of a controlled substance (Health & Saf. Code, § 11550, subd. (a)); he was placed on probation.

---

**13**     Defendant says he was 29. He was indeed 29 (although only a week shy of 30) when the probation officer interviewed him; however, he was 31 at sentencing.

(b)  In 2006, for unlawfully taking or driving a vehicle (Veh. Code, § 10851, subd. (a)); he was placed in a three-month camp program, which he completed.

(2)  As an adult:

(a)  In 2008, for carrying a loaded firearm in public while active in a gang (former § 12031, subd. (a)(2)(C)); he was placed on probation, on conditions including six months in jail.  This was his first strike.

(b)  In 2010, for unlawfully carrying a loaded firearm in public.  (Former § 12031, subd. (a)(1).)  He committed this offense while on probation.  He was sentenced to four years in prison.

(c)  In 2012, for active gang participation.  (§ 186.22, subd. (a).)  He committed this offense while on parole.  He was sentenced to 1 year 4 months in prison.  This was his second strike.

(d)  In 2015, for assault with a deadly weapon.[14]  (§ 245, subd. (a)(1).)  He committed this offense while on parole.  He was sentenced to six years in prison.  This was his third strike.  He could have been prosecuted as a third-striker, but he was prosecuted only as a second-striker.

Defendant's current offense was also a strike.  (§§ 667, subd. (d)(1), 1192.7, subd. (c)(31).)  He committed the current offense while on parole.

A social worker with the Public Defender's Office  carried out a "biopsychosocial assessment" of defendant.  She reported that his parents had already separated when he

---

[14]     Curiously, the victim of this crime was his brother James.

was born; he was raised by his father. His father worked full-time and could not provide adequate supervision. His father and all of his brothers were involved with gangs and used drugs.

According to the social worker, defendant expressed remorse "for all that ha[d] happened up until this point in his life" (though not specifically for his crimes). In her opinion, he had "gained dramatic insight into his behaviors with the assistance of a professional . . . ." "He has demonstrated a motivation to change his circumstances . . . ." She believed he would benefit from therapy.

B.     *Additional Procedural Background.*

Before sentencing, defendant filed a *Romero* motion. He argued that "he is a three-striker largely because of the family he was born into." He also argued that a determinate sentence would take him "well past the statistical age in which [one] is expected to commit violent crime."

At the hearing on the *Romero* motion, the trial court recapitulated defendant's criminal history, then concluded: "Despite having the opportunity to rehabilitate through juvenile probation, juvenile placement, adult probation and state prison, Mr. Maestas has failed to do so . . . . Mr. Maestas is not a person who should be deemed outside the spirit of the three strikes law in whole or in part. His *Romero* motion is denied." (Italics added.)

37

C.    *Discussion.*

Under section 1385, a trial court has discretion to dismiss a strike prior.  (*People v. Superior Court* (*Romero*), *supra*, 13 Cal.4th at pp. 529-530.)

With respect to striking a strike, the focus of the analysis must be on "'whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' [Citation.]"  (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

"Because the circumstances must be 'extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary."  (*People v. Carmony*, *supra*, 33 Cal.4th at p. 378.)

"[A] trial court's refusal or failure to dismiss or strike a prior conviction allegation under section 1385 is subject to review for abuse of discretion."  (*People v. Carmony*, *supra*, 33 Cal.4th at p. 375.)  "In reviewing for abuse of discretion, we are guided by two fundamental precepts.  First, "'[t]he burden is on the party attacking the sentence to

38

clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'" [Citation.] Second, a '"decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'"' [Citation.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id*. at pp. 376-377.)

As the trial court ruled, defendant's criminal history placed him directly in the bullseye of the three strike law. Indeed, he had not just two, but three strike priors. Prison, parole, and probation had failed to reform him; lenient treatment of his third strike likewise had had no effect. (See *People v. Mayfield* (2020) 50 Cal.App.5th 1096, 1108, fn. omitted ["Respondent was also given a tremendous break in 2017 when the court reduced his felony hate crime to a misdemeanor. . . . Yet, before the dust settled on that case, he went out and committed another hate crime . . . ."].) This demonstrated that only incapacitation was adequate to protect the public. "[T]he overwhelming majority of California appellate courts have . . . affirmed the refusal to dismiss[] a strike of those defendants with a long and continuous criminal career. [Citations.]" (*People v. Strong* (2001) 87 Cal.App.4th 328, 338.)

Defendant argues, as he did below, that his family history — an absent mother, an unavailable father, and familial gang involvement — predisposed him to gang membership and to crime. However, that does not place him outside the spirit of the three strikes law; to the contrary, it indicates that he is unlikely to rehabilitate and likely to recidivate.

Defendant also relies on the social worker's (unsworn) report. However, the trial court did not have to accept her opinion. She worked for the Public Defender's Office; thus, she was hardly neutral. Moreover, she accepted defendant's claims of rehabilitation at face value — "'I wish I knew then what I knew now'"; "he would like to be 'the man, the father' he knows he can be"; "he understands the negative impact his gang involvement has had on him and wants to 'man up' and 'do things differently." However, she did not know — as the trial court did — that defendant had repeatedly lied under oath.

Defendant argues that, although he used a firearm, he did not actually fire it. Nevertheless, he managed to fracture part of the victim's skull, put him in the hospital for nine days, subject him to an operation, and permanently impair his vision. Many bullet wounds are less damaging. In any event, this is more relevant to whether to strike the firearm enhancement than it is to whether to strike a strike. It is not an extraordinary circumstance and it certainly does not take defendant outside the spirit of the three strikes law.

Next, defendant argues that he was young when he committed the strike priors —
19 when he committed the first, and 23 when he committed the second. However, he
continued to commit strikes, one at 24 and the charged crime at 29. He "did not add
maturity to age. Quite the contrary." (*People v. Williams* (1998) 17 Cal.4th 148, 163.)

Finally, defendant argues that two of the strike priors qualified as strikes only
because he was active in a gang. He argues, again, that his family history predisposed
him to gang membership. This argument almost refutes itself. The Legislature has
defined certain crimes as strikes precisely because they are gang-related. (§§ 667, subd.
(d)(1), 667.5, subds. (c)(19)-(c)(20), 1192.7, subd. (c)(28).) The gang-related nature of
these two strikes is what brings him within both the letter and the spirit of the three
strikes law. If, indeed, he was predisposed, almost from birth, to be a gang member, then
he is all the more likely to recidivate in a gang-related way.

VII

MOTION TO STRIKE THE FIREARM ENHANCEMENT

Defendant contends that the trial court erred by denying his motion to strike the
firearm enhancement.

The trial court has discretion to strike a firearm enhancement. (§ 12022.5, subd.
(c).) "'[A] court's discretionary decision to dismiss or to strike a sentencing allegation
under section 1385 is' reviewable for abuse of discretion. [Citation.]" (*People v.
Carmony*, *supra*, 33 Cal.4th at p. 373; see also *id*. at p. 374.)

Defendant argues that it was an abuse of discretion not to strike the firearm enhancement, for two reasons.

First, defendant argues that dismissal is required by *People v. Vargas* (2014) 59 Cal.4th 635 (*Vargas*). *Vargas* held that when two strike priors are based on the same act, the trial court must strike one of them. (*Id*. at p. 645.) Here, defendant had three strike priors based on wholly separate acts, in 2008, 2012, and 2015.

Defendant argues, however, that here the *offense* of assault with a firearm and the *enhancement* for personal use of a firearm are based on the same act, and therefore, under the reasoning of *Vargas*, the trial court should strike the enhancement. *Vargas*, however, does not apply; it applies only to strikes. (*In re Alejandro B.* (2015) 236 Cal.App.4th 705, 711.) Moreover, section 12022.5, subdivision (d) specifically provides: "[T]he additional term provided by this section shall be imposed for any violation of Section 245 if a firearm is used . . . ." Defendant's proposed extension of *Vargas* would require us to judicially abrogate this subdivision. We must decline.

Second, defendant argues that dismissal is required because he used the shotgun as a blunt instrument, not as a firearm.

"[B]ehaviors which justify [an enhancement for] the 'use' of a firearm include not only the intentional discharge of the weapon or its employment to hit or strike the victim, but also the mere display of the weapon in a menacing or threatening way. [Citations.]" (*People v. Brookins* (1989) 215 Cal.App.3d 1297, 1304.) Again, defendant is essentially asking us to abrogate this definition.

42

Certainly the trial court could have taken into account the way defendant used the shotgun; however, that fact did not absolutely require it to dismiss the enhancement. As discussed in part VI.C, *ante*, the injuries defendant inflicted on the victim were tantamount to a gunshot injury. In any event, as discussed in part V.B, *ante*, the trial court found multiple aggravating factors and no mitigating factors; this alone was sufficient reason to refuse to strike the firearm enhancement. (*People v. McVey* (2018) 24 Cal.App.5th 405, 418-419.)

## VIII

## AMENDMENTS TO SECTION 1385

Defendant contends that he is entitled to a remand so the trial court can consider whether to dismiss the enhancements under newly enacted amendments to section 1385.

Since January 1, 2022, a trial court exercising its discretion to strike an enhancement must "consider and afford great weight" to certain mitigating circumstances. (§ 1385, subd. (c), Stats. 2021, ch. 721, § 1.) In particular, as relevant here, when "[m]ultiple enhancements are alleged in a single case . . . , all enhancements beyond a single enhancement shall be dismissed." (§ 1385, subd. (c)(2)(B).)[15]

These amendments, however, are expressly not retroactive. Section 1385, subdivision (c)(7) provides: "This subdivision shall apply to all sentencings occurring

---

[15] Defendant also cites the provision of section 1385 that requires the trial court to dismiss an enhancement that could result in a sentence of over 20 years. (§ 1385, subd. (c)(2)(C).) Here, however, the base term was 32 years to life; therefore, none of the enhancements "could result in" — i.e., could cause — a sentence of over 20 years.

43

after January 1, 2022." Defendant is not otherwise entitled to a remand for resentencing. Accordingly, he is not entitled to the benefit of the amended version of section 1385. (*People v. Flowers* (2022) 81 Cal.App.5th 680, 686, pet. for rev. granted Oct. 12, 2022.)

## IX

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____
P. J.

We concur:

McKINSTER _____
J.

MILLER _____
J.